WILBUR COWAN *vs.* EASTERN RACING ASSOCIATION, INC.

Suffolk. November 6, 1952. — April 7, 1953.

Present: QUA, C.J., LUMMUS, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Assault. Agency*, What constitutes, Scope of authority or employment, Agent's liability to third person, Subagency. *Racing. Evidence*, Relevancy and materiality, Of control of premises, Admissions and confessions.

Evidence warranted a finding that a steward and two police officers at a race track where racing was conducted pursuant to G. L. (Ter. Ed.) c. 128A were agents of the proprietor of the track acting within the scope of their authority when, at the stewards' stand to which a patron of the track had gone to make an inquiry after one of the races, the steward in question assaulted the patron and, summoning the two officers, instructed them to eject him, whereupon the officers committed a brutal assault on him. [141-145]

At the trial together of actions against the proprietor of a race track and against each of two police officers for assaults committed on the plain-

tiff, a patron, a patron at the track, by a steward and the two officers, the instructions to the jury on the issue of the proprietor's responsibility for the conduct of the steward and the officers were inadequate, misleading and prejudicial to the proprietor. [145–146]

The fact that the proprietor of a race track was acting only as agent of a charitable organization in conducting certain racing at the track would not relieve the proprietor of liability for assaults committed upon a patron of the track during such racing by a steward and two police officers if the steward and the officers in committing the assaults were agents of the proprietor acting within the scope of their authority. [146–147]

At the trial of an action against the proprietor of a race track for assaults committed on a patron of the track by alleged servants of the defendant at the stewards' stand, evidence of the existence of a liability insurance policy indemnifying the defendant against claims for personal injuries arising on the property used for racing should not have been admitted to show control of the stewards' stand by the defendant. [147]

TORT. Writ in the Superior Court dated May 27, 1947.

The action was tried before *Swift*, J.

*Charles C. Petersen*, for the defendant.

*Herbert L. Barrett*, (*John J. Mackin* with him,) for the plaintiff.

COUNIHAN, J. This is an action of tort to recover for an assault on the plaintiff by certain persons alleged to be agents or employees of the defendant when the plaintiff was a business invitee of the defendant at Suffolk Downs, a race track in Boston, owned by the defendant. The answer was a general denial, and by amendments there were special answers in the first of which the defendant denied that the assault was committed by the defendant, its agents or servants or by anyone acting in behalf of the defendant, and further set up that if there was any assault on the plaintiff it was committed by two police officers of the city of Boston acting in their own defence and in the public interest; and the second set up that the defendant at the time of the assault was acting as an agent for the National War Fund, Inc., an established charitable organization, in the conduct of the racing meeting on the day of the assault, and that all profits derived from such meeting were turned over to the National War Fund, Inc., and other local char-

itable organizations without any benefit or profit to the defendant.

This action was tried to a jury together with two other actions against the police officers who were involved in the assault.[1] The jury returned verdicts against all three defendants.

This action comes here upon exceptions of the defendant to the denial of its motion for a directed verdict; to the denial of fourteen requests for rulings; to five portions of the judge's charge; and to the admission of evidence.

For a better understanding of the issues here presented we deem it appropriate to direct attention to certain statutes and to certain rules of the State racing commission made by virtue of one of said statutes. General Laws (Ter. Ed.) c. 6, § 48, inserted by St. 1934, c. 374, § 2, as amended by St. 1941, c. 596, § 3, provides for the appointment of a State racing commission, hereinafter called the commission. General Laws (Ter. Ed.) c. 128A, inserted by St. 1934, c. 374, § 3, as amended in certain respects not here material, legalizes horse and dog racing meetings in this Commonwealth and permits wagering on the results under the parimutuel or certificate system at racing meetings licensed by the commission under c. 128A, § 3, as amended. Section 7 provides for the appointment of one or more representatives to attend each racing meeting to observe and report to the commission any violations of c. 128A. Section 8 reads: "The commission *may* apply to the local police authorities for, and said authorities shall thereupon assign, such number of police officers to be on duty at any racing meeting . . . as the commission *may* deem proper. Police officers so assigned shall report to the commission and shall perform such duties as *may* be required by the commission. The licensee shall pay to the commission a sum equal to the salaries of police officers so assigned . . ." (emphasis supplied). Section 9 reads: "The commission shall have full power to prescribe rules, regulations and conditions under

---

[1] *Cowan* v. *McDonnell* and *Cowan* v. *Ingenere, post,* 148.

which all horse or dog races at horse or dog racing meetings shall be conducted in the commonwealth . . . ." Rule 21 of these rules which were in evidence designates certain officials of a racing meeting, in which are included three stewards, and a clerk of the scales. Rule 22 provides that all such officials shall be appointed by the licensee "subject to the approval of the Commission, which reserves the right to demand a change of personnel for what it deems good and sufficient reasons . . . ." Rule 22 (A) provides for the appointment of a "Commission Steward who shall daily report his observations to the Commission." (Apparently this steward is the representative referred to in § 7 of c. 128A. He was not involved in the assault.) Rule 22 (B) by inference provides that the salaries of all officials appointed by the licensee shall be paid by such licensee. Rule 25 provides that the stewards shall have general supervision over owners, trainers, jockeys, grooms, and other persons attendant on horses, and all other officials of the meeting. Section 27 reads: "All questions pertaining directly to racing, arising during the period of the meeting, shall be determined by the Stewards . . . ." Section 34 reads: "The Stewards shall have control over and free access to all stands . . . enclosures, and other places in use for the purpose of racing." Rule 42 reads in part: "in matters pertaining to racing the orders of the Stewards supersede the orders of the officials of the Association" (the licensee). Rule 43 reads: "The Stewards shall keep a record of all complaints made to them and the disposition thereof and shall furnish a copy of same to the Commission." Rule 44 reads: "The Stewards shall take notice. of corrupt riding and other questionable transactions on the turf. Complaint thereof *can be made by any person* . . ." (emphasis supplied).

From evidence disclosed in the bill of exceptions considered in its aspect most favorable to the plaintiff the jury could reasonably have found the following facts: On August 11, 1945, the plaintiff, with his wife and her daughter, was in attendance at Suffolk Downs, a race track owned by the

defendant. They all paid the required admission fees. A racing meeting was being held under a license granted by the commission. A license had been originally issued to the defendant to conduct a racing meeting for fifty-four days beginning June 11, 1945, and ending August 11, 1945, except Sundays. Following a written request to it from the National War Fund, Inc., an established charitable organization, the defendant petitioned the commission to transfer that part of the license for the last four days of such meeting to the National War Fund, Inc., with the defendant acting as its agent. These days were from August 8 to August 11, 1945, inclusive. On August 1, 1945, the commission voted to approve the transfer of the license of the defendant for these days to the "National War Fund, Inc. — Eastern Racing Association, Inc. Agent." The net proceeds of these four days of racing were substantially paid to the National War Fund, Inc., and certain other local charities.

The plaintiff bought a $10 ticket on a horse called "Johnny, Jr.," to win in the seventh race. This horse finished first by a length and the plaintiff noticed nothing wrong in the manner in which the race was run. As he went to collect on his ticket he heard loud "hollering" and he learned that a foul had been claimed. Subsequently the race was declared official and it appeared that "Johnny, Jr.," was placed third so that the win ticket was of no value. The plaintiff became excited and upset and sought information, without success, at the window where he bought the ticket, as to why his horse was disqualified. He then talked with the clerk of the scales. As "a result of that conversation" he went across the track to the stewards' stand. To get there he had to climb over an iron fence four and one half feet in height and cross the race track. The stand which was on the other side of the track opposite the grandstand looked as if it was "on stilts with stairs going around and up." It was enclosed by glass. The plaintiff walked up the circular stairway and entered a room about eighteen feet by nine feet in size. He saw there one Almy, one Conway, and one Conkling who is also called Conklin in the bill of exceptions.

These three men were the stewards appointed by the defendant under Rule 22 of the rules of the commission and had been acting as such during the earlier days of the meeting as well as from August 8 to August 11, 1945, inclusive. The plaintiff put his ticket on "Johnny, Jr.," on a table in front of Almy and asked him why that horse had been disqualified from winning. Almy told him that he would talk with him after he had finished making out a report which he was then writing. The plaintiff waited for two or three minutes and then spoke to Almy again. He made no attempt to strike anybody and there was no loud talk. While he was standing at the table talking to Almy, Conkling walked up to the plaintiff and kicked him in the "shins." Conkling then beckoned to the police and two officers came into the room. He said to them, "Throw the son of a bitch out." They were the defendants in the actions tried with this action. They grabbed the plaintiff from behind and, as he struggled to get away, they beat him many times on his head and body with their billies. The plaintiff fell to the floor where he was beaten again and kicked by the police officers. The plaintiff was brutally assaulted. He suffered severe injuries, was bleeding profusely from his head, and as a result was taken to the Boston City Hospital for treatment. The police officers were part of a detail of the Boston police department on duty at Suffolk Downs under a Lieutenant O'Brien. The commission did not hire or pay the police although it could have because the commission had such power under the statute but it never exercised it. There was no direct evidence as to who hired the police but it could be fairly inferred that they were hired by the defendant because a check in payment for their services in the sum of $1,368 was drawn to the order of the police commissioner (of Boston) and signed "Eastern Racing Assn. Inc. Agents for National War Fund, Inc.," by its officers. This check was indorsed by the police commissioner. The three stewards in the stand were appointed by the defendant or by it at least as agent for the National War Fund, Inc., and were paid by checks of the "Eastern Racing Assn. Inc. Agents for National War

Fund, Inc." The defendant appointed and paid these stewards and had a right to discharge them.

We first consider the defendant's exception to the denial of its motion for a directed verdict. The disposition of this exception depends largely upon the application of the principle of respondeat superior, and we must therefore determine whether the steward Conkling or the police officers who were involved in the assault were at that time in the control of the defendant and acting as its agent or agents within the scope of their employment.

The principle respondeat superior is not applicable unless it could reasonably be found on the evidence together with all permissible inferences "that the relation of master and servant existed at the time the plaintiff was injured, whereby the . . . act of the servant was legally imputable to the master. The test of the relationship is the right to control. It is not necessary that there be any actual control by the alleged master to make one his servant or agent, but merely a right of the master to control. If there is no right of control there is no relationship of master and servant. If the power of control rests with the person employed, he is an independent contractor." *Khoury* v. *Edison Electric Illuminating Co.* 265 Mass. 236, 238.

This is the rule in this Commonwealth and is generally accepted in other jurisdictions. Restatement: Agency, § 220. Mechem on Agency (2d ed.) § 1863. 57 C. J. S., Master & Servant, § 563. 35 Am. Jur., Master & Servant, § 539. This rule is applicable although the choice of persons for the particular work is required to be made from a limited class. Restatement: Agency, § 223.

In the *Khoury* case it was also said at page 239, "Although the conclusive test of the relationship of master and servant is the right to control, other factors may be considered in determining whether the right to control exists, but they are subordinate to this primary test. This court has held that the method of payment is not the decisive test. . . . Neither is the fact that . . . [one] was an employee of the defendant and had no other employment decisive, for a person

may be an agent or a servant as to one part of an undertaking, and an independent contractor as to other parts." To the same effect is *Wescott* v. *Henshaw Motor Co.* 275 Mass. 82, where it is said at page 87, "It has been frequently decided that one may be the agent or servant of another in some matters and not the agent or servant in other matters." Likewise "it is the right to control rather than the exercise of it that is the test. . . . While engaged in the same general work, one may be at certain times and for certain purposes the servant of a party, and at other times or for other purposes an independent contractor or the servant of another." *McDermott's Case*, 283 Mass. 74, 77, and cases cited.

Where more than one conclusion is possible the question is for the jury. *Marsh* v. *Beraldi*, 260 Mass. 225, 231. "The inferences which should be drawn from the evidence as to the relations of . . . [one to another] and to the defendant were not matters of law as the defendant contends, but questions of fact to be decided by the jury under suitable instructions." *Cain* v. *Hugh Nawn Contracting Co.* 202 Mass. 237, 239. It was also said in *Choate* v. *Assessors of Boston*, 304 Mass. 298, at page 300, "The existence of the relationship of principal and agent and the authority of the latter to represent the former are questions of fact if there is evidence of an appointment by the principal and a delegation to the agent of duties to be performed by him for the principal, or if the conduct of the parties is such that an inference is warranted that one was acting in behalf of and with the knowledge and consent of another."

In the instant case we are of opinion that one of two conclusions could be found by the jury as matter of fact on the evidence. The first one is that in determining the qualifications of horses and jockeys, corrupt riding, questionable practices such as the artificial stimulation of horses, the weights of jockeys, fouls, and the order in which horses finish, the stewards appointed and paid by the defendant had exclusive jurisdiction, and that when acting upon such matters these stewards could be found to be agents of the

commission or independent contractors required to be employed by the defendant under the rules of the commission. On the other hand, on the evidence the jury could reasonably find that at the time of this assault the steward Conkling was acting as an agent for the defendant even though the rules of the commission provide that the stewards appointed by the defendant shall have control over and free access to all stands.

The plaintiff was a business invitee of the defendant, at least in its capacity as an agent for the National War Fund, Inc. Whether he was properly in the stewards' stand to make a complaint is of no consequence for excessive force was used to evict him. While talking to one of the stewards about the complaint, Conkling assaulted him and calling the police, by the use of opprobrious words, told them to throw the plaintiff out of the stand. A struggle ensued and a brutal assault followed. Conkling was appointed and paid by the defendant. The stand where the assault took place was owned by the defendant. Conkling apparently assumed that the plaintiff was an interloper and causing a disturbance. Conkling and the other stewards under the rules had control of the stand and presumably had authority to evict obnoxious persons from it and that was for the purpose of seeing to it that racing was orderly conducted. Proper performance of their duty in this respect could reasonably be expected to enhance the reputation of the defendant with its customers for maintaining order and advance its business which was to conduct racing for a profit. If they failed to perform their duties in this respect, the defendant could discharge them. To this extent at least it could be found that the defendant had a right to control them.

It is not unreasonable to assume that Conkling believed that to preserve order in the stand he had a right to call upon the police to assist him. Otherwise there was no need of the presence of the police at the stand. It is clear therefore that if Conkling assaulted the plaintiff, or if the police at his instigation were guilty of the assault, the defendant

could be found liable. "An inference of responsibility on the defendant's part was by no means the only permissible inference, but we think that it was a possible one." *Hartigan* v. *Eastern Racing Association, Inc.* 311 Mass. 368, 371.

But apart from the question of agency of Conkling and the responsibility of the defendant for his conduct, we are of opinion that the question whether the police officers involved in the assault were acting as agents of the defendant was also for the jury to decide. They were paid by the defendant and they were hired by the defendant for the obvious purpose of preserving and maintaining order on the premises of the defendant during the racing meetings. The maintenance of such order, the prevention of breaches of the peace, with the possibility of ensuing riots, would serve to afford protection to and avoid damage to the physical plant used for racing, which was conceded to be owned by the defendant. In this capacity the police officers were acting not as public officers in a public place but as employees of the defendant for its private purposes on its private premises. It is also reasonable to assume that part of their duty was to prevent annoyance or injury to patrons of the defendant and to that end they could evict from any part of the premises persons who might be causing a disturbance. "Acts habitually performed by an agent may import acquiescence by the principal and become evidence of his authority." *Hartigan* v. *Eastern Racing Association, Inc.* 311 Mass. 368, 370, and cases cited.

We are of opinion that this action was properly submitted to the jury, and the exception of the defendant to the denial of its motion for a directed verdict must be overruled.

The defendant has argued that it is not responsible for the brutal assault on the plaintiff by Conkling or the police officers because none of them was acting within the scope of his employment when they assaulted the plaintiff. There is no merit in this contention. The case of *Perras* v. *Hi-Hat, Inc.* 326 Mass. 78, cited by the defendant, is readily distinguishable. The police officers there involved in an assault were in no sense employees of the defendant. The

question of the use of excessive force. did not arise for agency alone was considered. The correct rule is stated in *Fanciullo* v. *B. G. & S. Theatre Corp.* 297 Mass. 44, where at pages 46–47 with cases cited this court said, "In a place of public amusement where large numbers of people are accustomed to gather, the maintenance of order may incidentally require the use of force. . . . A master not infrequently may be liable for conduct of a servant who uses means not intended or contemplated by the contract of employment." This rule is recognized in Restatement: Agency, § 245, "A master who authorizes a servant to perform acts which involve the use of force against persons or things, or which are of such a nature that they are not uncommonly accompanied by the use of force, is subject to liability for a trespass to such persons or things caused by the servant's unprivileged use of force exerted for the purpose of accomplishing a result within the scope of employment." See *Hirst* v. *Fitchburg & Leominster Street Railway,* 196 Mass. 353; *Mason* v. *Jacot,* 235 Mass. 521; *Frewen* v. *Page,* 238 Mass. 499; *Zygmuntowicz* v. *American Steel & Wire Co.* 240 Mass. 421; *Hartigan* v. *Eastern Racing Association, Inc.* 311 Mass. 368; *McDermott* v. *W. T. Grant Co.* 313 Mass. 736; *Schultz* v. *Purcell's, Inc.* 320 Mass. 579.

We are of opinion, however, that in several respects the charge of the judge was inadequate, misleading, and prejudicial, and for these reasons the exceptions of the defendant to the charge must be sustained. This action was tried with the other actions against the police officers involved in the assault. The charge necessarily should have treated with the liability of the defendant as a principal and the liability of the police officers as individuals. Nowhere in the charge is this distinction pointed out and no instruction was given the jury that the defendant would not be liable unless it had the right to control the steward Conkling or the police officers. In fact the judge told the jury that the defendant "had control of the personnel; their stewards were there, the same stewards that conducted the other

50 days of the race meeting. There was no change." If by this the judge meant that these stewards were in the control of the defendant, he was wrong because this was not a matter for the judge to decide, for the question of agency was for the jury to pass on under suitable instructions. The judge was likewise in error in that part of the charge in which he dealt with the question of control of the stewards' stand. He emphasized the fact that the defendant owned all of the premises and for that reason exercised control over them. We assume without deciding that the question of control of premises in some circumstances may, with suitable instructions, have some bearing upon the liability of the defendant in a case like this. But the real question here to be determined by the jury was the right of the defendant to control Conkling or the police officers. Proper instructions to this effect were omitted. The charge also stressed the point that the defendant paid Conkling and the police officers. This is not decisive on the question of the right to control them. It only has a bearing on the right to control and that was not discussed in the charge. The question of the responsibility of the defendant for the conduct of Conkling or the police officers was not submitted to the jury with adequate instructions.

In view of what we have said, we need not consider the first eleven requests of the defendant.

The last three requests relate to the contention of the defendant that in no event was it liable because it was acting as an agent of a charitable enterprise when the assault occurred. This point is not discussed in the defendant's brief other than casually with no citation of authority. Boston v. Dolan, 298 Mass. 346, 355. In any event there is no merit in this contention. It still remained a question for the jury to decide who had the right to control Conkling or the police officers. In Barnard v. Coffin, 141 Mass. 37, at page 41, this court said, "if the agent, having undertaken to do the business of his principal, employs a servant or agent, on his own account, to assist him in what he has undertaken, such a sub-agent is an agent of the agent . . . ."

See *Pease* v. *Parsons,* 273 Mass. 111, 118; *Moran* v. *Plymouth Rubber Co. Mutual Benefit Association,* 307 Mass. 444, 446. Compare *Reavey* v. *Guild of St. Agnes,* 284 Mass. 300.

We have examined the defendant's exceptions to the admission of evidence and find it necessary to discuss but one of them; others either are without merit or relate to matters not likely to arise on a retrial of the case. The one which concerns us relates to the admission of testimony as to the existence of a liability policy at the time of the assault indemnifying the defendant as agent for the National War Fund, Inc., against claims for personal injury arising on the property of the defendant used in the conduct of racing meetings. When this evidence was admitted nothing was said about the purpose of such evidence and no limitation was put upon its applicability. From the charge of the judge it is apparent that it was admitted to show control of the stewards' stand by the defendant.

This exception must be sustained.

It was said in *Minkkinen* v. *Nyman,* 325 Mass. 92, at page 95: "The policy in question, which was offered solely on the issue of control, was a blanket policy covering the entire premises and not merely the apartment which the plaintiff was entering . . . . The policy, among other things, contained a provision whereby the insurer undertook to defend the insured against any actions for personal injuries arising out of the ownership, maintenance or use of the premises, including actions which were groundless. Since there was ample scope for the operation of the policy apart from liability for defects in the steps where the plaintiff was injured, the existence of such insurance would not constitute an admission on the part of the defendants that they had retained control of the steps." *Calabresa* v. *Lynch,* 271 Mass. 58, 61. *Salsman* v. *Frisch,* 276 Mass. 228, 230. *Hannon* v. *Schwartz,* 304 Mass. 468, 470. *Perkins* v. *Rice,* 187 Mass. 28, relied upon by the plaintiff, is distinguishable. The *Minkkinen* case and those cases cited in it appear to us to be decisive on the insurance point.

*Exceptions sustained.*